The next case on tap is Kitsap Rifle and Revolver Club versus Northland Insurance Company. Case number 24-3064. Can I press the podium? Yes, please. And you're Mr. Foster, is that correct? Yes, Your Honor. And it was a little bit last minute, but my firm filed an association of counsel this morning. It was supposed to have happened last week, but the holidays sort of interrupted that process. And I changed firms. I was the attorney for Kitsap Rifle and Revolver Club since 2010 at my old firm, but I changed firms at the beginning of May. And it just took a little while to bring my new firm online as the club's counsel.  So we are now associated in as counsel along with the Chenoweth Law Group for appellant Kitsap Rifle and Revolver Club. All right. Okay. May it please the court, I am Brooks Foster representing Kitsap Rifle and Revolver Club, also known as KRSC or the club, which is a nonprofit firearm shooting club chartered in 1926 for sport and national defense. Since then, the club has always operated at a 72-acre parcel that it leased from the Washington Department of Natural Resources until 2009, at which point it acquired ownership of the property in a land swap with the DNR in Kitsap County. This is a liability insurance coverage lawsuit about the duties an insurer has to its insured that is accused of harming wetlands and other public waters of the state. In this appeal, KRSC assigns five errors to the district court's summary judgment decision. The first relates to its motion for partial summary judgment that Northland had a past duty to defend and that that duty began on the date of tender, October 28, 2010. Northland did not dispute that it had a past duty to defend, but contended that duty was immaterial. The district court agreed, denied KRSC's motion, and dismissed the claim. This was an error because the past duty to defend is material to at least three other claims asserted by KRSC. The first is its claim for coverage-related attorney fees under Olympic Steamship. The second, its claim for denial of defense coverage for its site development permitting application, which denial occurred in 2016. The third is the club's claim for about $48,000 in invoiced defense costs that Northland never paid. If any one of those claims is reinstated, KRSC should also receive partial summary judgment that Northland had a past duty to defend. Apart from the past duty to defend, it seemed to me that the heart of the case really depends on this definition of occurrence and whether there was an occurrence. What is your best argument as to why there was an accident here? Well, first, Your Honor, I would like to address the premise of your question, which is that that is the heart of the case. I respectfully disagree. It is an important issue. But in Washington, as we've thoroughly briefed, under the case of Immunex, the duty to defend when it is assumed by the insurer continues until it is relieved of that duty by a court order. Well, that's really my other question. I want to separate the two, though. So I want to get an answer on occurrence. And then I recognize that there is separately the issue we have to contend with, duty to defend. So if you would address yourself to the occurrence and how the statutory language or the contract language fits here. Yes, Your Honor. So this is a general liability policy. It applies to occurrences. And we generally think of that as an accident. So if there were any case laws recognized it. Yeah, that's correct, Your Honor. The case law, there's plenty of case law interpreting these basic policy provisions. Right. The case of Hales is one of the critical cases on this. It basically said it construed this issue of whether there was an accident or occurrence. And it said if any of the harm could have occurred without the insured intending and expecting it, you know, without it being certain that it would occur, then there is a possible liability for an accidental occurrence. And it is the possibility of that liability that we're focused on in the club's briefing because the issue is whether there is an ongoing duty to defend. That's the issue that this element speaks to. But we have to figure this out first. So where – I know you're talking about possibility and duty to defend. But where is your claim that the damages were caused by this accident or occurrence as opposed to intentional conduct? So there are a number of circumstances in the findings and allegations that are relevant to this that support the inference that the club could be held liable for an accidental occurrence. First of all, the findings are that there was earthwork occurring in the 300-meter range area in 2005. And then the county showed up and put a stop work order on that. The district court erroneously wrote that the club was found to have already known and to have already been informed before it did that work that it was not to do the work without a permit. That is not in the findings in the original trial judgment. In fact, the club was not informed that it needed a permit until the stop work order was issued. Also, the club believed that it had a nonconforming use right, which it did have, that included the right to construct shooting areas because that's the way it had operated historically. It had constructed shooting areas in the past without permits. So it believed that was part of its grandfathered rights. It took a 14-day bench trial to sort that out and decide that against the club. But that happened in 2010. Excuse me, 2011, Your Honor. Then we have a number of facts that are not found. So we don't even know who was operating the machinery that moved the earth. But maybe most fundamentally, the trial court could not even decide or declined to decide whether the earthwork had in fact harmed a wetland in the area of the 300-meter range. It referred to a suspected wetland and said it was explicitly not deciding whether the county had shown the existence of a wetland in that area. So it left that open to be decided in a future proceeding, whether the permitting proceeding it ordered or a warrant of abatement proceeding it also ordered to occur at the county's request, if and to what extent the local permitting proceeding did not resolve all the violations. So the trial court cannot even tell exactly where the wetlands were or whether one was harmed. It did find diversion of surface waters. But, and maybe this is the paramount point, it did not decide whether the club had to restore anything. Okay, so if the harm we're talking about getting coverage for is causing harm to public waters that require restoration, which that is the trigger of coverage here, and the trial court did not decide whether that type of harm had occurred, we cannot say that the club was certain to have caused that harm. So then this gets to my question is then how is it money damages? Because I take the district court's point that the policies don't cover injunctive relief, but it covers money damages. And as I understand it, the club is not obligated to pay for anything right now. It could just sit and not do anything. There hasn't been a warrant of abatement. There hasn't been anything that affirmatively requires the club to pay environmental damages or mediation or anything. So how is there a coverage issue based on that? So first of all, Your Honor, it's not every injunction that it fails to expose an insured to damages. Okay, and you have to look at the terms. So an injunction is a court order, and we've cited the Accelo Corp case. It's from a different state, but it's emblematic of the way environmental liability insurance works. If an agency asks a party to conduct an investigation, courts, including the Ninth Circuit, construe that to be equivalent to an order. It's coercive. You don't disrespect EPA or ecology when they ask you to investigate a site. They can also order it. In Accelo Corp, that's what happened. The state agency ordered a site investigation on allegations of groundwater contamination. Now, because it was an order, did that mean that all the work that occurred under the order was remedial and not investigative, was indemnity and not defense? That was the issue in Accelo Corp. We chose that case because it spoke directly to the issue that we're discussing right now. The trial court in the underlying case ordered the club to apply for permitting. It did not pre-decide the outcome of that process. That is like the state agency in Accelo Corp ordering a remedial investigation. It did not decide whether there was going to be restoration and repair of groundwater in that case. I thought what the court ordered was if you wish to continue operating, you needed to seek conditional use permits and go forward. There's a conditional element to this. That was reversed, Your Honor. I realize this case has a long tail. It's complicated in the underlying case and it's complicated in this coverage action, but especially in the underlying case. The original trial judgment did order the club to stop operating until it could get a conditional use permit. That was reversed in the very first appeal, modified on remand, resulting in the permitting order, which the club's failure to comply with because Northland wouldn't pay for its application, caused it to be held in contempt. Okay, so that's their conditional use permit. I thought the court canceled the contempt. It did, but the club remained subject to the order to obtain permitting. And the cancellation of the contempt sanction did not abate the harm to the club because after the trial in this case, the county passed an ordinance that said unless a shooting range gets an operating permit, you can't operate. And then they decided that because the club was not in compliance with the permitting order and had not applied for site development activity permitting, it could not obtain an operating permit. So the harm continued. The club is in legal limbo because it is like a party that's been ordered to perform a site investigation of a contamination site and can't do it because it doesn't have the money and its insurer denies payment of what it contends their defense costs. I'm still not quite sure if you answered Judge Sanchez's question, which is what are the damages that are covered by the policy? Yes, Your Honor. There are several cases in Washington that have held that restoration cost. So the party that does the groundwater investigation, to use that analogy, if they're required to remediate the groundwater, then they have restoration or repair costs, and those are a form of damages. It's like being held liable for repairing someone else's property that you've harmed. The public waters are someone else's property. If the club is ordered to restore and repair wetlands and surface waters, the cost of that is a form of damages under Washington law. But that's an if because the club hasn't applied, and so we don't know that there's a remediation requirement attached to it. That's correct, Your Honor. You're speaking in hypothetical terms. The county is alleging that claim. It has not yet been resolved. The defense is ongoing. The club is stuck in limbo because its defense is not concluded. The only way right now for it to find out whether it can successfully avoid this alleged liability, the county is still alleging, still subject to the underlying trial court's jurisdiction. That was ordered. And, by the way, the county seems content to leave the club in limbo, but that's another issue. If the club cannot proceed with its defense, it will be stuck in this position forever, potentially ceasing to exist. All we want is for – well, not all we want, but the claim is either to require Northland to pay for the permitting application costs that it denied in 2016 when it was defending. Now, this is critical, okay, because we – You characterize that as a part of the defense cost? Yes, exactly. Not as a coverage. That's correct. And I construe coverage, which is the term used by Northland to mean indemnity. Right. That's what that means. We're really – none of the issues presented say that the club is entitled to indemnity. We're saying it's premature and there are questions of fact about indemnity. That was the fifth assignment of error. So you – just to be clear, in your view, the contract covers the permitting costs? The duty to defend includes the cost to pay for the permitting application. After we get the permit – And do you have a case for that? Yeah. Because that's an unusual position to take. Yeah, well, that's – Permitting is just – it's a standard – I mean, this goes back to – Plus you're doing business. Right. This goes back to Judge McEwen's question about what makes this an accident as opposed to an intentional conduct because usually a property owner is intentionally making modifications to their property and they're seeking a permit. And this doesn't usually sound in an accidental occurrence. Well, we actually cited a case from Georgia where a party – where an insurer was required to pay for a wetland restoration. But I love this AcceloCorp case because it really bridges this case about wetlands and public waters with the large body of environmental insurance coverage case law that already exists that maybe some of your honors have some familiarity with. When EPA or a state agency orders a party to investigate a site, that party has to then provide a work plan and get approval for that. It's basically a permitting process, your honors. So for the trial court, if the trial court had said, you're going to come to me with your permitting terms and I'm going to decide whether you get them or not, and then we're going to decide the outcome of whether you have to restore anything, there would be no question that that's part of the defense. But because they ordered a separate process before the local government, does that take it out of the defense? No, because that process is necessarily part of the defense. But an AcceloCorp specifically said, just because it's ordered doesn't mean it's not part of the defense. You have to look at whether it's reasonable and necessary to limit or avoid the alleged liability. That's exactly the case here, your honors. We have to apply for the permit, negotiate and advocate to minimize the liability. Maybe we can prove there's no duty to restore wetlands and surface waters. And then the defense would be successful. If we have to restore wetlands and surface waters, then there's a liability that there may be a duty to indemnify. Does the county have other claims not related to the wetlands? It did, but those have all at this point been resolved, your honor. How were they resolved? Through multiple rounds of appeals. Much of the case was about altering the club's historical use rights or limiting them to remain within the scope of its non-conforming use. So the only thing left is this alleged that the work or whatever it was, the modifications, damaged the wetlands. Yeah, that's right, your honor. That's all that's left. That's really all that's left to be done. And, you know, the county could have potentially said we want a warrant of abatement proceeding because the club isn't applying for permitting. It didn't do that. It hasn't done that. And I was actually going to. Do you have. Just a really quick thing about. It's. I actually just was thinking that if. Why are you so sure that the permitting process would require environmental mitigation? Because the county, if it wanted to have remediation, could step in with a warrant of abatement. And I think that would put you more in the posture of Excel than where we are now. But it hasn't done that. And so we're again left in this kind of hazy area. Well, the word of abatement says we're tired of asking you to do things. We're going to do it ourselves. We've got a warrant to come onto your property, which we normally couldn't do. We're going to do the work and charge you money for it and seek a judgment against you for the county. I think in its own interest has decided not to do that at this point. But if you look at the trial court's orders, especially what it said after the first remand, I think it answers your question quite directly. Your honor. It said the permitting order is to cure the violations found by the trial court in the original trial judgment. Those include the violations in the area of the 300-meter range that included diversion of surface water and also potentially include the harm to wetlands that the trial court said were suspected but not clearly proven to exist, but it wouldn't decide whether they existed or not. So that is within the bailiwick of the site development activity permitting process to decide what work was done, what permitting terms are needed to retroactively allow it, and does that include some restoration of these surface waters or wetlands. Let me move you just to a different subject because your time is running out. I know, your honor. And that has to do with this $48,000 that is hanging out there as unpaid defense costs. I can't really, the district says that that balance wasn't explained. So can you tell us where in your briefing or the record we find an explanation for the $48,000? Well, so the very, I think in the opening brief we laid out the facts very thoroughly and in the reply as well, and there are very careful citations to the record, your honor. I don't have them all memorized, but what we have is a declaration of club executive officer Marcus Carter, based on personal knowledge, always involved in the case from its inception, saying there were invoices issued by the club's defense attorneys for defense work. Northland paid the vast majority of those or almost all of them, but didn't pay $48,000, and the balance was carried through the invoices. So it's just a balance of the defense costs. Yeah, that's correct, your honor. And the testimony of Marcus Carter is that was for work related to the underlying case. You know, at the time of the summary judgment when it was filed, we didn't know for sure why Northland had not paid them, but we knew they hadn't been paid and it was a claim that had been pleaded. And so we presented a body of evidence to support that. As the briefing explains, the evidence come back in rebuttal did not foreclose questions of fact, and the trial court's reasons for denying that claim did not adequately express what a reasonable fact finder could infer and find based on the evidence, so that was in error. But can I just conclude with one final point, your honors? Again, it's so critical. The club doesn't need to prove an ongoing duty to defend to prevail on many of these claims. I just want to make that so perfectly clear to your honors, because in Washington, if there's a duty to defend, until it's relieved, that relief is not retroactive, and until it's relieved, there's a duty to pay defense costs. Understood. Duty to defend is broader than the duty of coverage to pay under the indemnity. I just have a – let me just – I want you just to – I don't know – I haven't come to any final conclusions about this case at all. But assume for a moment that the judgment were affirmed, okay? And then let's say a year from now the county says, ah, we're tired of this mess. We've got to get this cleaned up. You're not going to do it? We're going to do it. We're going in and we're going to do the warranty proceeding, whatever. We're just going to take care of this. Too bad. And they say – and then they come back and they say, you're going to pay for it. You still have a defense, don't you? And could you tender that to the insurance company? I think that would be dismissed with prejudice based on the district court's decision. Why? Because you just said – you argued earlier that it's unclear whether or not there's even any particular protected area in play. Northland is arguing there's no possibility of a covered liability because of the findings that have been made. That they really foreclose any possibility of a covered liability. Well, but suppose the county steps in and says, you know, look, we think there is damage. We're going to go out and take care of it. We're going to prove it. We're going to clean it all up and you're going to pay for it. And send you the bill. And that's true. Why can't you then say, hey, insurance company, this has been an ongoing claim. You've got to pay. And Northland would clearly be in the right to say the district court decided there was no possibility of coverage. We have defenses such as – Well, I don't know. I don't know what you want to say there. Well, I mean, this is exactly what I'm – Because I've been thinking – We wouldn't have the right to. No, but I've been thinking about it, though, because the warranty proceeding is – why wouldn't that be just a separate proceeding, distinct? So the unit that triggers defense is a suit. And that would be part of the same suit. The trial judge retained jurisdiction over that, actually issued orders granting it, subject to further proceedings. So the case is still open. It hasn't been closed. And so it's part of the same suit. So the defense is for the entire suit until the insurer is relieved of that. But if he's got a finding from the state trial court that there are two – that he's not making – that he was not making any findings to the wetlands, why would that – you know, that there was damage to wetlands. Why would that foreclose – I mean – So, first of all, there was a finding of diversion of surface water. So I want to make that clear. We do have that. Okay. We don't know if there's a duty to restore. That remains open-ended. But the possibility of that should trigger the ongoing duty to defend. If – I'm unclear on what in your hypothetical the reason for affirming the district court would be. But if it was on all the grounds stated – I'm just saying – I'm just – Yeah. If it was a full affirmance on all the grounds stated by the district court, there would be no remaining right of the club to seek coverage for anything related to the specifically related to the warrant of abatement. I mean, that would have been litigated. You know, we're saying that claim is still pending. It's still being alleged. It hasn't been decided. And you're saying, well, what if we say – agree with the district court saying, it's not actually a pending claim. And then the county comes and renews it. That wouldn't be a new claim. I mean, there are cases where the same parties get into successive litigation.  But usually there has to be some new occurrence. There wouldn't be a new occurrence here. I mean, that would always be part of this same case in controversy. I was just trying to think through this. No, I appreciate that. And I hope my answer is helpful. Okay. Thank you. Okay. Thank you, Your Honors. Good morning, Your Honors. Eric Neal on behalf of Northland Insurance Company. Northland asked that this court affirm the district court in all respects. With all due respect to counsel, I disagree with the notion that this is a complicated case. I think Your Honor hit the nail on the head. The heart of this case is whether there was an occurrence. There's some other things we can talk about. But where is the accident here? I don't think that the club is making the argument at this point that they accidentally did all this site work out on their property without permits or that they didn't know the law. That was an argument made at the district court level, and I think the district court correctly rejected that. What they're saying now is that we didn't really know the consequences of what was going to happen. And I think that's both legally and factually incorrect. From a legal standpoint, the question is whether something is an accident, is whether the result is both, even if it's an intentional act, whether the result is something that wouldn't be foreseeable by a reasonable person. And that factually just isn't the case here. They installed two 470-foot culverts for purposes of diverting a stream. And when they installed those, the stream got diverted. So, in fact, the work that was done performed exactly as was intended. It wasn't an unforeseeable or unforeseen consequence. But that example even goes a little bit further. Was the mountain damaged to the wetlands? Damage to wetlands, if that was the case that the county put on, and this kind of shifts over into the notion of whether there was damages caused by property damage on this property. In terms of whether there's an occurrence, I don't think that we get into accidental conduct at any point here. And we really have to look at what the issue really was in the superior court. It wasn't about damage to wetlands and repairing damage or environmental cleanup or anything like that. The district court, I think, repeated this several times. The county sued to abate the nuisance that was caused by the increasing use of the property in terms of exploding targets and increased weapon calibers and paramilitary training. And it sued for unpermitted site work. And it's about the permits. Did they intentionally go out and do work without getting permits? And we have the record. On that point, because it's like we're listening to two different cases here to some degree. So if the Rifle Club was required to pay for basically restoring, restoration costs, that would be environmental remediation, right? Correct. And that typically under Washington law would be treated as a response cost that is a damage. Yes. The cases that are cited in support of that by the club are cases involving Department of Ecology intervention, the CERCLA actions, where based on state and federal strict liability environmental laws, the costs of doing work are damages under a policy. But again, that's not what the county sought here. Okay. So that's what I wanted to now go to the two points that you raised. So let's go to the permitting costs. Right. Which was your first point. Where do the permitting costs fit in, in your view, with respect to the contract language? Permitting costs, the permitting costs here are the cost of complying with an injunction. Now, the case involving the unpermitted site work was effectively over in 2016 after the first appeal. The ongoing appeals and the modifications to the court's order related in 2022, 23, whatever the time frame was, those related to the club's challenges to the escalated use injunctions. After 2016, there were no further appeals, no further litigation involving the unpermitted site work and the Superior Court's injunction requiring the club to get permits before it could resume operations. Now, I was thinking of an example. Imagine if the county had sued a nightclub due to a noise nuisance and the Superior Court said, you're right, I'm granting that injunction, you can't operate as a nightclub until you take care of this noise problem. At that point, when the injunction is issued, the case is over. The only thing that happens next is what does the club do to comply with that injunction. Now, it could certainly turn down the noise. It could spend a bunch of money to convert itself to a wine bar, much quieter environment. It could spend a bunch of money to put up baffling on the walls, insulation, noise-canceling technology. Are those defense costs? Are those something covered by their insurance policy? No, those are just costs of complying with an injunction in order to resume their preferred business activities on that property. So, I don't think that the costs of permitting fit within the mold of a defense cost. Because what is a defense cost? A defense cost is a cost to defend an active and ongoing claim. It's something that, but once the county had received the injunction that it requested, then there was no longer anything to defend. So, defense counsel's activities going forward on that point were directed towards the nonconforming uses and not relating to the injunction. What about the contempt sanctions? Because if you were right and it ended, then there would not have been a follow-up of issuance of contempt for not getting the permits. Right? Right. And I get and I understand that the court has since canceled the contempt requirements. But that suggests to me that there is something a little more ongoing in terms of a legal obligation. And, Your Honor, in terms of the contempt proceedings, Northland paid for the defense of those proceedings. All of the – But that's not my point. My point is you're making the argument that things have stopped. There was a contempt sanction. The contempt sanction has been canceled. But the underlying obligation, the order, still remains, which is, I think, what your colleague on the other side is pointing to as saying things aren't over. There's still this prospect of something happening in the future, and that's the hook for defense costs. Your Honor, again, I go back to the point that really it's the obligation of the insured to comply with an injunction. We pay for damages that an insured is legally obligated to pay because of property damage caused by an occurrence. Now, what they're trying to do is they're trying to take that – the judgment that was entered here wasn't the money judgment. It was an injunction. And what they're trying to suggest is that rather than paying damages to the county, the insurer is obligated to pay the insured to do work on their own property in order to comply with an injunction. And that's just simply apples and oranges. And it's not – the permitting costs have nothing to do with defending the insured in court for a claim being asserted by the county for damages. What about their other point, it seemed to me, that was central to the argument, is that they're in this limbo situation because the county could come back. It probably won't. So they're just sitting there and that that exposure to potential damages invokes some kind of duty. And I think that goes to Judge Paisa's point – questions when Mr. Foster was speaking. And the suggestion that there is the potential for some action to be taken by the county, there's always that potential. The county could sue for money damages tomorrow and say, hey, we've determined that the work you did on your property bled over into county-owned property and caused damage, and so we want money damages. They could do that tomorrow. One of the neighboring properties could find a bunch of lead in their backyard, spent casings or whatever, and they might sue for damages. A new claim can be brought at any time. And to suggest that this case is just going to remain open forever and ever is really kind of a fallacy. The fact of the matter is, what is an insurance company and third-party liability context required to do? Defend and indemnify. Well, the club was provided with the full and complete defense, and there's nothing left to defend. There's no active claim. And indemnify. But there's no judgment for money damages due to property damage caused by an occurrence here. There's an injunction. So let's say that the county did the unthinkable and came back and said, okay, we're going to fix it all up and send you the bill. Yeah. Then there would be damages, right? There likely would be. And that could be tendered to Northland or any of the club's subsequent insurers. I don't believe my client has insured the club for a number of years, but it could be tendered to any number of carriers, including my client. It would have to be reviewed. We would have a good-faith obligation to investigate and determine whether there's a defense and indemnity obligation. But the question is, based upon the judgments that have been entered against the club today, is there a duty to defend? Is there a duty to indemnify? And the answer on both of those points is no. Well, you dealt with the permitting, and then you said you had a second point related to nonconforming uses. And that that actually was the second part of the county's complaint against the Rifle Club. What were you referring to there? I mean, is that some pending claim resulting in damages? No. At the end of the day, Your Honor, there still has never been any kind of damage award granted by the Superior Court requiring Kitsap Rifle to pay Kitsap County money damages. It doesn't exist. Can I ask you to turn back to the occurrence discussion? Yes, Your Honor. Do I understand your argument to be that the whether something is an accident or not depends on whether someone has filed a permit? Is that – let me give you a hypothetical. Suppose the club had sought and obtained permits for its work on the property, and – but during the course of that work, something unanticipated happened with the water table or just something that they – you know, wasn't expected to happen, and it causes damage to the wetlands or someone. Would that be a tendered claim for an occurrence, or is it the fact that they were intentional in seeking a permit and doing that work? Would that foreclose that type of a claim under the policies? I think, Your Honor, there is a pathway in a hypothetical situation to situations where permits are issued or sought or there's a misunderstanding of what the scope of a permit may include. Obviously, in construction cases, we run into this all the time where unforeseen site conditions require maybe updated permitting, but the insured fails to go out and get that updated permitting, and that results in some sort of unforeseen consequence. But here, the club knew it needed to get permits because it sought permits. It began the process in 1996 and then failed to follow through and started doing the work anyways. And then in 2005, the county issued a stop work order. It said, stop working and get permits for this stuff, and the club ignored that and continued to do work on the property. And so are there hypothetical situations where permitting applications and stuff can lead to an occurrence? Certainly. Absolutely. But not on these facts, Your Honor. And again, what we're talking about here, too, is kind of this idea of unintended consequences. There's no record whatsoever presented by the club. It's a self-serving argument made in brief only that they didn't know that they were going to cause harm or that they didn't know that they were going to cause damage to wetlands. Well, that's not the point. The point is, did they suspect or would a reasonable person have known that by moving hundreds of cubic yards of material and building structures on a property without getting permits, that that might lead to the county coming in and saying, stop work, you need to get permits for this? They may not have intended it to cause any damage or to result in damage to protected wetlands. Right. Correct? I mean, so for example, they built these two culverts to divert water from a stream that I guess crossed over the shooting range. Right. Is that right? Is that what happened? Yes. And so they wanted the water out of the way, the stream. And as it turns out, that water, when it rains, I guess those culverts weren't big enough. But the water could, as I am from reading the findings of fact from the Superior Court, the water could overflow and cause damage to the land. Right. Which, I mean, maybe they, you know, they were just trying to divert the water. They weren't trying to, you know. Exactly. They didn't anticipate, I mean, reasonably didn't anticipate any. We didn't know that by diverting water we were going to cause situations that could result in pooling or flooding here or this or that. Isn't that, why doesn't that, could that qualify as an accident? That also is not in the record, Your Honor. You will not find a declaration from a member of the club that says that. You will not find any evidence from the club suggesting that they didn't know that there was a possibility that by diverting water they could cause problems. And that's the real point on that issue. Is it based on a reasonable person expectation or individual? It's a question of whether the result is reasonably foreseeable. Right. Is the result of your intentional act reasonably foreseeable, even if it's not the exact thing you expected to happen? The question is, I mean, they may have expected, Your Honor, that those culverts were going to be good enough and water was just going to flow and it was going to be nice and easy. But the question is, can a reasonable person expect or reasonably foresee that by diverting water there is a possibility of causing problems? And I'll point out, too, and I don't think we've really discussed this, there is an exclusion for property damage on property you own. And nobody has suggested that any of this caused any damage outside of the Kitsap Rifle property. So I think for a number of reasons, you've got an occurrence here. You don't have an occurrence here because it was reasonably foreseeable. And again, I'll turn to the real point, which is it's reasonably foreseeable that by doing a bunch of work on your property without getting a permit, you may end up getting sued by the county for not having permits. And that's what really happened here. This is not an environmental cleanup case. This is not a case where there's been a warrant of abatement. Well, it could be, wouldn't it? The warranty of abatement. Couldn't it result in – It could. So what's your response? You know, assuming, you know, just hypothetical. And I said, there's a lot to this case. And I don't have any – I haven't yet come to any conclusion about what should happen here. But suppose the judgment is affirmed and a year later the county says, hey, we've got to clean this up. You're not doing it. We're doing it. Right. And here's the bill. Right. And one would expect – Can they – does this – does the affirmance of this judgment foreclose them from ever coming back? Not at all. Not at all. The question is based upon what is before this court. Is there a present duty to defend or indemnify? If a new claim is made – But why? If we affirm and part of that affirmance is finding that there was no occurrence, isn't that race judicata to something going forward in the future? I mean, if part of the affirmance is the confirmation that there was not coverage on the basis of no occurrence and then the county comes in with a warrant of abatement to fix these things, doesn't that have preclusive effect on trying to file a claim in the future? Because the underlying action that causes the warrant of abatement is something that was not an occurrence. It was an intentional act. That very well may be the case, Your Honor, but the fact of the matter is my client, if it was tendered, would have an obligation to investigate, determine coverage independent of – and my client may rely upon this court's ruling or the district court's ruling, but we would still have an independent obligation to evaluate and investigate that claim. And if you can't – they can't change the facts just because a new claim is made. If a warrant of abatement is in the future made and this court and the district court have determined that there was never an occurrence, well, they can't unring that bell by saying now there's a warrant of abatement that's been issued. It was all an occurrence, an accident all along. We still have an obligation to investigate. I take your point, and I think, of course, the club can always tender a claim and you would have a duty to investigate it, but it seems to me as a practical matter that that would probably go nowhere if this wasn't affirmed at this stage. You don't have to answer that, but – Well, let me – would you answer just real quickly this hanging $48,000, which the district court says wasn't supported. He says, no, no, it's in the record, it's in our brief. This one is very strange. The only evidence that has been submitted on that $48,000 – I'll direct the court to the excerpts of the record at page 425 and 426. This is supported by a declaration by a member of the club, and he says that this is something that was given to me by defense counsel, and it's a two-page – it's like a one-and-a-half page. It appears to be like an internal bookkeeping spreadsheet of some sort maintained by defense counsel. There's never been an explanation for what it actually is or what it means. There's no explanation in the declaration. Northland has never – has invited but has never been provided with. Tell us what wasn't – specifically what wasn't paid. Tell us what we didn't pay. When you're asking, tell us what we didn't pay. Yeah, if there's a bill out there that wasn't paid and – because all we have is this ledger, and it doesn't really explain to us what wasn't paid or what they think should have been paid. It may be that – and clients do this all the time. They may be challenged a line item on a bill or a set of line items for whatever reasons, but we've invited them to say, tell us why something that wasn't paid should be paid. And that has never been provided. The district court correctly found that it's really just not a supportive plan. I have your point in mind. Thank you. Thank you, Your Honor. Ms. Foster, we'll give you three minutes. Thank you, Your Honors. So if you believe the cost of the permitting application that Northland refused to pay in 2016 was a defense cost, then Northland – that claim should be reinstated because Northland breached its duty to defend, which it was attempting to perform at that time. You don't have to reach any of the policy interpretation coverage issues because Northland was defending. It had a duty to pay reasonable defense costs at that time. Our briefs show whether it was a defense cost is a question of fact, should not have been found against the club as a matter of law and undisputed fact. If you want to simplify things down, that is the most important point for the club. Okay. The least – there was a discussion about, you know, what is the standard or who has the burden of proving one of these coverage exclusions. When it comes to the duty to defend, a mere possibility of a covered liability arising in the future in the suit at issue triggers the duty to defend. It is the insurer's burden to foreclose that possibility. This is a very, very high burden. It's one of the highest in liability coverage law. Northland had to prove through some finding or uncontrovertible aspect of the allegations against the club that the only possible liability that could result would be excluded by the policy. It has not done that. There are still many undetermined questions that could decide things like whether there was an accidental occurrence. It is not the club's obligation to litigate all of those issues at this time because it is still defending itself. There was a gross misrepresentation, Your Honor, I say this with all due respect, of the record of evidence related to the $48,000. I would just implore, Your Honor, to please read that. Read what? The briefing filed by the club. I read the briefing, but I'm still a little at a loss. Okay. I'm getting to that, Your Honor. Okay. Well, first of all, criticism of the evidence presented by the club falls short because Northland was the moving party. It had to raise the issues to which the club was supposed to respond. Northland didn't even flag this claim as one upon which it was moving for summary judgment. All you really need to do is look at the evidence filed by the club and the evidence filed by Northland on these points and ask yourself, is there a genuine issue material fact about this claim? Did Northland foreclose it? It didn't. In Hales, there was a covered occurrence where the insured turned on an irrigation system that harmed an onion crop. Turning on the irrigation system is deliberate, intentional knowing. Harming the onion crop is not. It is the consequences that matter when it comes to the occurrence or accident question. So I know we've taken a lot of your time. I really appreciate your honors, and I appreciate the opportunity to appear before you today. Thank you, counsel, and thank you both for your very helpful arguments. The matter will stand submitted.
judges: McKEOWN, PAEZ, SANCHEZ